# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

NICOLE ONCALE                                                CIVIL ACTION

VERSUS                                                        No. 19-14760

CASA OF TERREBONNE PARISH,                                   SECTION I
INC. ET AL.

## ORDER & REASONS

Before the Court is defendants CASA of Terrebonne, Inc. ("CASA"), Donna Brunet ("Brunet"), and Carl McNabb's ("McNabb") (collectively, the "defendants") motion[1] to dismiss plaintiff Nicole Oncale's ("Oncale") complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion is granted in part and denied in part.

## I.

This case arises from Oncale's claims against the defendants for disability discrimination, failure to accommodate a disability, and retaliation in violation of the Rehabilitation Act ("RA"); interference with and denial of leave in violation of the Family Medical Leave Act ("FMLA"), and retaliation for requesting and taking such leave; retaliation for exercising rights pursuant to the Employment Retirement Income Security Act ("ERISA"); intentional interference with a contract in violation of Louisiana law; engaging in unfair or deceptive acts or practices in violation of the

---

[1] R. Doc. No. 7.

Louisiana Unfair Trade Practices Act ("LUTPA"); and intentional infliction of emotional distress.[2]

Accepting all of the factual assertions in Oncale's complaint as true, they are as follows: Oncale began working for CASA as a community relations coordinator in 2013.[3] CASA receives federal financial assistance, which it uses, in part, to employ staff.[4] In June 2018, Oncale was diagnosed with Stage 3B inflammatory breast cancer.[5] Oncale informed her supervisor, Brunet, of her diagnosis, and Brunet assured her that her job was not in jeopardy and that CASA would provide her with the necessary time to recover.[6]

With CASA's approval, Oncale began taking paid time off for chemotherapy treatment on July 5, 2018.[7] As of July 16, 2018, Oncale had accrued eighty hours of vacation and forty hours of sick time for the year.[8] During her six months of chemotherapy treatment, she took off about a week and a half each month from work.[9] Although, to earn "flex time" Oncale worked many thirteen-hour days to compensate for the time she took off during treatment, Brunet informed Oncale in August 2018 that she would soon exhaust all of her paid time off.[10]

---

[2] *See* R. Doc. No. 1.
[3] R. Doc. No. 1, at 3 ¶ 9.
[4] *Id.* at 3 ¶ 8.
[5] *Id.* at 3 ¶¶ 12–13.
[6] *Id.* at 4 ¶ 14.
[7] *Id.* at 4 ¶ 15.
[8] *Id.* at 4 ¶ 16.
[9] *Id.* at 4 ¶ 17.
[10] *Id.* at 4 ¶¶ 18–19.

Brunet permitted Oncale to take unpaid time off during the summer and fall of 2018, consistent with CASA policy, which refers to the FMLA and states that employees are eligible for up to three months of personal leave, including leave for medical reasons.[11] In October 2018, Brunet gave Oncale an "outstanding" performance review, but reprimanded her for being tardy to work.[12] However, Oncale's tardiness was due to her chemotherapy treatments, for which CASA had already approved time off.[13]

On November 14, 2018,[14] Oncale informed Brunet, via email, that her mastectomy surgery was scheduled for December 4, 2018.[15] Oncale advised Brunet that she anticipated being away from work for four to six weeks following the surgery, but that she would also require some time off prior to the surgery for preoperative appointments.[16] Brunet inquired as to whether this would be the only surgery that Oncale would be having, and Oncale responded that radiation would follow this first surgery for thirty minutes a day for a period of six weeks, followed by a second surgery that would be scheduled three to six months after radiation was completed.[17]

---

[11] *Id*. at 4 ¶¶ 20–21.

[12] *Id*. at 4–5 ¶ 22.

[13] *Id*.

[14] The complaint states that Oncale informed Brunet of her surgery on November 14, 2019. *Id*. at 5 ¶ 23. The Court assumes this is a typographical error, and that Oncale informed Brunet on November 14, *2018*, because her surgery took place in December 2018. *Id*. Similar typographical errors are found throughout the complaint but do not affect the substance of the parties' arguments. *See id*. at 5–8 ¶¶ 27, 32–33, 36–37, 40.

[15] *Id*. at 5 ¶ 23.

[16] *Id*.

[17] *Id*. at 5 ¶ 24.

The following week, Brunet stopped speaking to Oncale.[18] On November 21, 2018, Oncale asked Brunet whether she and CASA's board president, McNabb, were planning to fire her.[19] Brunet and McNabb confirmed that they were considering terminating Oncale due to her need to take leave.[20] Brunet subsequently informed Oncale that leave for her first surgery was covered by the FMLA, but that this leave would expire while she recovered from the surgery.[21]

On November 27, 2018,[22] Oncale emailed the board of CASA, including McNabb, and requested a meeting to discuss CASA's intention to terminate her employment.[23] Oncale stated in the email that, "I have to have the surgery or I will die" and that she would require four to six weeks of leave after the surgery for recovery.[24] Oncale also inquired as to whether she would be able to keep her job, and she stated that she needed to know for purposes of insurance and income.[25] Oncale never received a response to her email.[26] That same day, Oncale informed Brunet that she could potentially return to work just four weeks after her surgery, instead of six, but Brunet did not respond.[27]

---

[18] *Id.* at 5 ¶ 25.
[19] *Id.*
[20] *Id.*
[21] *Id.* at 5 ¶ 26.
[22] *Id.* at 5–6 ¶ 27.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* at 6 ¶ 28.

Brunet and McNabb met with Oncale on November 28, 2018, two days before Oncale took leave for her surgery.[28]  Brunet said that she spoke with the Honorable Ernestine Grey, president of National CASA, who informed her that Oncale was protected by the FMLA, and that Brunet needed to terminate Oncale because she was a "liability."[29] Brunet informed Oncale that she was qualified to take twelve weeks of leave pursuant to the FMLA, but that by December 27, 2018, such leave would expire.[30] Brunet explained to Oncale that CASA was going to terminate her employment because her anticipated return date, four weeks post-surgery on January 4, 2019, was a few days after the expiration of her FMLA leave.[31] Brunet and McNabb told Oncale that they would mail her a letter stating that she was terminated as of November 28, 2018.[32]

Brunet and McNabb stated that Oncale was also being terminated because of her inability to return as a full-time employee after surgery.[33]  Oncale responded that she could, in fact, work full time after surgery, but Brunet stated that she did not believe Oncale, as Oncale had to undergo radiation post-surgery.[34] Oncale explained that her doctor advised her that radiation was less harsh than chemotherapy, and she reminded Brunet that she had already worked through chemotherapy.[35] Oncale

---

[28] *Id.* at 6 ¶ 29.
[29] *Id.* at 6 ¶ 30.
[30] *Id.* at 6 ¶ 31.
[31] *Id.* at 6 ¶ 32.
[32] *Id.* at 6 ¶ 32.
[33] *Id.* at 6 ¶ 33.
[34] *Id.* at 6–7 ¶¶ 33–34.
[35] *Id.* at 6–7 ¶ 34.

made clear that she planned to work while receiving radiation and that she only needed leave for her upcoming surgery.[36] Oncale further clarified that she would not need time off for daily radiation, as she could receive treatment after work each day.[37] Brunet again disagreed, stating that she had witnessed a friend experience radiation and had "googled" it.[38]

McNabb then requested to speak with Oncale's oncologist regarding how the radiation would affect her ability to work, to which Oncale agreed.[39] Oncale asked Brunet and McNabb to allow her to remain employed until at least December 27, 2018, the day her FMLA leave expired.[40] Brunet and McNabb agreed, and they confirmed that Oncale would be fired if she did not return to work by December 27, 2018.[41] McNabb told Oncale to "go ahead" and sue them if she wished, as "no one has ever won before."[42] During this meeting, Brunet and McNabb also expressed that Oncale had always performed exceptionally.[43]

During the next few days following the November 28, 2018 meeting, McNabb spoke with Oncale's oncologist who confirmed that Oncale would be able to work while receiving radiation.[44]

---

[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.* at 7 ¶ 35.
[40] *Id.* at 7 ¶ 37.
[41] *Id.* at 7 ¶ 36.
[42] *Id.*
[43] *Id.* at 7 ¶ 37.
[44] *Id.* at 7 ¶ 39.

On December 4, 2018, Oncale underwent the mastectomy surgery as scheduled.[45] On December 21, 2018, Brunet emailed Oncale to see how she was doing.[46] Oncale responded that she was not experiencing any health issues, but that she would still require radiation for thirty minutes per day.[47] Oncale also requested certain accommodations, including time off for physical therapy (once per week for thirty minutes for six weeks) and immunotherapy (one day off per month).[48] Oncale stated that she assumed that Brunet or CASA's board would have to make the decision as to whether to continue to work with her treatment schedule.[49] Brunet never responded to Oncale's email.[50]

On December 26, 2018, Oncale followed up with Brunet via email, inquiring as to whether Brunet was waiting to see if Oncale would return to work the following day or waiting for the board's reply as to Oncale's ongoing treatment schedule.[51] Brunet called Oncale later that day and informed her that she was terminated.[52] Brunet stated that Oncale could maintain her insurance coverage at her own expense of over $400 per month.[53] Oncale expressed her belief that the decision was unfair,

---

[45] *Id.* at 8 ¶ 40.
[46] *Id.* at 8 ¶ 41.
[47] *Id.* at 8 ¶ 43.
[48] *Id.*
[49] *Id.*
[50] *Id.* at 8 ¶ 44.
[51] *Id.* at 8 ¶ 45.
[52] *Id.* at 9 ¶ 46.
[53] *Id.* at 9 ¶ 47.

considering that she was not given the chance to return to work by December 27, 2018 as previously discussed.[54]

Oncale alleges that she could have returned to work earlier, with different accommodations, had she known that she was going to be terminated.[55] For example, Oncale could have arranged to work from home or for an AmericaCorps[56] VISTA member to temporarily cover some of her job duties while she was absent.[57] According to Oncale, she was terminated before she had the opportunity to discuss these potential accommodations with CASA.[58]

CASA replaced Oncale with Christine Aucoin, who was not disabled and had not taken leave pursuant to the FMLA.[59] Soon thereafter, CASA also hired Anna Merlos, who is also not disabled, for the position of office manager.[60] CASA never offered Oncale reinstatement to her previous position or the position of office manager, despite her being qualified to perform the job duties associated with both of these roles.[61]

Unlike Oncale, CASA permitted other employees not experiencing medical issues to take up to six months of unpaid leave without being terminated.[62] For

---

[54] *Id.* at 9 ¶ 46.
[55] *Id.* at 9 ¶ 48.
[56] It is unclear to the Court whether this is a typographical error and Oncale intended to instead reference "AmeriCorps."
[57] *Id.* at 9 ¶¶ 49–50.
[58] *Id.* at 9 ¶ 49.
[59] *Id.* at 9 ¶ 52.
[60] *Id.* at 9 ¶ 53.
[61] *Id.* at 9 ¶ 54.
[62] *Id.* at 10 ¶ 55.

example, in late 2016, Jerri Thompson, then the office manager, took three months of leave after the passing of an immediate family member.[63] In early 2017, she again took three months of leave, and CASA permitted her to return following this time off.[64] In 2017, CASA provided Sulma Reyes, the advocate supervisor, with six months of leave following the birth of her children.[65]

After losing her job in December 2018, Oncale began to suffer increased anxiety and experienced depression for the first time.[66] As a result, she is under the care of a psychiatrist and primary care physician, and she is prescribed medication for depression and anxiety.[67] Oncale has also experienced a loss of income because she has been unable to find new employment.[68] Oncale will also likely have to seek health insurance coverage through Medicaid, which "will limit her treatment options and[,] likely, decrease the quality of care she will receive as she continues to recover from her cancer treatment."[69]

Oncale initiated suit on December 24, 2019.[70] The defendants filed the instant motion[71] on April 21, 2020, which Oncale opposes.[72]

---

[63] *Id.* at 10 ¶ 56.
[64] *Id.*
[65] *Id.* at 10 ¶ 57.
[66] *Id.* at 10 ¶ 58.
[67] *Id.*
[68] *Id.* at 10 ¶ 59.
[69] *Id.* at 10 ¶ 60.
[70] *See* R. Doc. No. 1.
[71] R. Doc. No. 7.
[72] R. Doc. No. 9.

## II.

Pursuant to Rule 12(b)(6), a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547).

A facially plausible claim is one in which "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

In assessing the complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Furthermore, "the Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 6, 2011) (Vance, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v.*

*McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

Oncale asserts seven claims for relief, each of which the defendants argue should be dismissed.[73] The Court will address each count in turn.

### III.   Count One

Count one alleges that CASA intentionally discriminated against Oncale based on her disability in violation of section 504 of the RA, 29 U.S.C. §§ 701 *et seq.*[74] Count one also alleges that CASA failed to reasonably accommodate Oncale in violation of the RA.[75]

CASA argues that, with respect to count one's discrimination claim, Oncale fails to state how she was disabled as defined by the RA and how she was otherwise qualified for her position at the time of her termination.[76] These two issues are also fundamental to count one's failure to accommodate claim and to count two, retaliation in violation of the RA. With respect to the failure to accommodate claim, CASA argues that Oncale failed to request a reasonable accommodation and, in any event, no reasonable accommodation existed.[77]

### A.  Rehabilitation Act Discrimination Claim

The RA provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in [§ 705(20)], shall, solely by reason of her or his

---

[73] *See* R. Doc. Nos. 1 & 7.
[74] R. Doc. No. 1, at 11–12 ¶¶ 61–74.
[75] *Id.*
[76] R. Doc. No. 7-1, at 4–6
[77] *Id.* at 7–10.

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Compensatory damages, injunctive and equitable relief, and reasonable attorneys' fees and costs are available for a claim of intentional discrimination pursuant to 29 U.S.C. § 794. *See* 29 U.S.C. § 794a; *Miraglia v. Bd. of Supervisors of Louisiana State Museum,* 901 F.3d 565, 574 (5th Cir. 2018).

The RA adopts the standards used in determining claims under the Americans with Disabilities Act ("ADA"). *Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 399 (5th Cir. 2012). "The language in the ADA generally tracks the language set forth in the RA, and jurisprudence interpreting either section is applicable to both." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (internal quotation marks and citation omitted); *see also Miraglia,* 901 F.3d at 573–74 ("The remedial scheme of the two statutes are generally interpreted interchangeably[.]").

To establish a prima facie case of discrimination under the RA, "a plaintiff must show that (1) she has a disability; (2) she was otherwise qualified for her job; (3) she worked for a program or activity receiving Federal financial assistance; and (4) that she was discriminated against by reason of her . . . disability." *Sapp v. Donohoe*, 539 F. App'x 590, 595 (5th Cir. 2013) (internal quotation marks and citations omitted). CASA challenges the first two elements of Oncale's *prima facie* case.

### i.      Whether Oncale Has a Disability

Section 705(20) of the RA provides that the term "individual with a disability" is to be given the same meaning as defined in the ADA, 42 U.S.C. § 12102.  The term "disability" means, with respect to an individual, "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Oncale argues that her cancer constitutes a disability under all three prongs.[78]  The Court agrees.

The definition of "disability" must be construed broadly. *Id*. § 12102(4). The term "substantially limits" must also be "interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." *Id*. The ADA Amendments Act of 2008 ("ADAAA") was passed in response to decisions by the U.S. Supreme Court that, according to Congress, had "created an inappropriately high level of limitation necessary to obtain coverage under the ADA." Pub.L. No. 110–325, 122 Stat 3553 at 3554. Congress passed the ADAAA to reinstate "a broad scope of protection . . . available under the ADA." *Id*. (citing *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999) and *Toyota Motor Mfg., Kentucky Inc. v. Williams,* 534 U.S. 184 (2002)[79]).

---

[78] R. Doc. No. 9, at 3–9.

[79] CASA relies on the standard set forth in *Toyota Motor* to argue that Oncale's cancer does not qualify as a disability under the RA. R. Doc. No. 7-1, at 5. This argument is clearly foreclosed by the ADAAA. *See Neely v. PSEG Texas, Ltd. Partnership*, 735 F.3d 242, 245 (5th Cir. 2013) ("[T]he ADAAA primarily focuses on broadening the definition of 'disability' by singling out and superseding . . . *Toyota Motor Manufacturing Kentucky, Inc. v. Williams,* 534 U.S. 184[.]").

13

Turning to the first prong, the definition of "major life activities" includes the operation of "major bodily functions," including "normal cell growth." 42 U.S.C. § 12102(2)(B). An impairment need only substantially limit one major life activity to be considered a disability. 42 U.S.C. § 12102(4)(C). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D).

The Court concludes that Oncale's breast cancer qualifies as a disability under the first prong of the definition. The Court finds that breast cancer, when active, "substantially limits" the "major life activity" of "normal cell growth." *See* 42 U.S.C. § 12102(4)(A), (B); § 12102(2)(B). Therefore, whether Oncale was in remission when CASA terminated her is of no consequence.[80] *See* 42 U.S.C. § 12102(4)(D). In addition, Oncale's breast cancer qualifies as a disability even if the only "major life activity" it "substantially limited" was "normal cell growth." *See* 42 U.S.C. § 12102(4)(C).

The Court's conclusion is consistent with regulations issued by the Department of Justice, the agency responsible for the implementation and enforcement of the RA, which state that the term "'physical or mental impairment' includes, but is not limited to, such diseases and conditions as . . . cancer." 28 C.F.R. § 41.31(b)(1)(ii); *see also United States Equal Employment Opportunity Comm'n v. T&T Subsea, LLC*, No. 19-12874, 2020 WL 2063725, at *5 (E.D. La. Apr. 29, 2020) (Ashe, J.) ("It is undisputed that colorectal cancer is a disability under the ADA."); *Norton v. Assisted Living*

---

[80] CASA argues that Oncale was not disabled because her complaint alleges that she was not experiencing any health issues and was cancer free at the time of her termination. *See* R. Doc. No. 7-1, at 5.

*Concepts, Inc.*, 786 F. Supp. 2d 1173, 1184–86 (E.D. Tex. 2011) (holding that the plaintiff's renal cancer, although in remission, qualified as a disability under the ADA); *George v. Fresenius Med. Care N. Am.*, No. 15-14, 2016 WL 4944130, at *12 (M.D. La. Sept. 15, 2016) ("There is no dispute that cancer and lymphedema qualify as disabilities under the ADA.") (citations omitted).

CASA argues that because Oncale failed to expressly allege in the complaint how her breast cancer limited one or more major life activities—i.e., normal cell growth—she cannot qualify as disabled for purposes of the RA.[81] The Court disagrees. Oncale's allegations concerning her breast cancer, especially her allegations that she received chemotherapy and required further medical treatment including surgery and radiation, plausibly state that her condition substantially limited the major life activity of normal cell growth. *See Holt v. Houston Methodist Sugar Land Hosp.*, No. 19-564, 2020 WL 989911, at *4 (S.D. Tex. Feb. 10, 2020) (holding that the plaintiff plausibly alleged that her conditions, including tumors in her reproductive system and a blood clotting disorder, limited the major life activity of normal cell growth, even though she did not specifically allege in her complaint that such conditions limited normal cell growth).

Furthermore, even assuming that Oncale fails to satisfy the first prong of the definition of disability, she can still satisfy the first element of her *prima facie* case by alleging that she has a record of breast cancer or that CASA regarded her as suffering from cancer. *See* 42 U.S.C. § 12102(1).

---

[81] R. Doc. No. 7-1, at 5.

An individual meets the requirement of "being regarded as having . . . an impairment" if the individual "establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not* the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3) (emphasis added).

While CASA states that Oncale was not regarded as disabled by her employer,[82] Oncale's complaint sufficiently alleges facts to the contrary. Oncale disclosed her cancer diagnosis to CASA six months before her termination, and several conversations purportedly took place between CASA and Oncale that revolved around her breast cancer diagnosis and how her treatment schedule would affect her ability to work.[83] Furthermore, Oncale alleges that she was terminated because CASA believed that she could not return to work full time after her mastectomy while undergoing radiation.[84] *See Dansby-Giles v. Jackson State Univ.*, No. 10-214, 2012 WL 5843158, at *4 (S.D. Miss. Nov. 19, 2012) (holding that there was a genuine dispute of material fact as to whether the plaintiff was disabled, because she alleged she had a disability and the defendant was at all times aware of her disability); *Garcia v. Potter*, No. 09-973, 2010 WL 2025068, at *5 (W.D. Tex. May 18, 2010) (finding that the plaintiff pled sufficient facts to show that the defendant regarded him as having an impairment because his supervisors were aware of his lifting restriction).

---

[82] *Id.*
[83] *See* R. Doc. No. 1, at 3 ¶ 13, 9 ¶ 46.
[84] R. Doc. No. 1, at 6 ¶ 33; R. Doc. No. 9, at 7–8.

Oncale also sufficiently alleges that she has a record of disability with CASA, as she updated CASA regarding her health throughout her treatment process, requested and took periods of time off to receive and recover from treatment, and even facilitated a discussion between her oncologist and employer.[85] *See* 28 C.F.R. § 41.31(b)(3) ("Has a record of such an impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."); *Adams v. Rice*, 531 F.3d 936, 951 (D.C. Cir. 2008) (finding that a genuine dispute of material of fact existed as to whether the plaintiff was disabled under the RA because certain evidence alleged that her employer knew that she had a history of breast cancer).

Accordingly, Oncale has plausibly alleged that she satisfies the first element of the *prima facie* case—i.e., she has a disability as defined by the RA.

### ii.   *Whether Oncale Was Otherwise Qualified*

CASA also challenges the sufficiency of Oncale's allegations with respect to the second element of her *prima facie* case—i.e., that she was otherwise qualified for her position.[86] A "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Fifth Circuit has set forth a two-part inquiry to determine whether a plaintiff is "otherwise qualified." *Sapp*, 539 F. App'x at 595. Courts must first determine whether the

---

[85] R. Doc. No. 1, at 5 ¶¶ 23–24, 6 ¶ 29, 7 ¶¶ 35, 39.
[86] R. Doc. No. 7-1, at 6.

17

plaintiff could perform the essential functions of the job. *Id.* If the court concludes that the plaintiff is not able to perform the essential functions of the job, the court must then determine whether any reasonable accommodation by the employer would enable her to perform those functions. *Id.* The plaintiff bears the burden of requesting reasonable accommodations. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

With respect to the first part of the two-part inquiry, CASA argues that Oncale could not perform an essential function of her job as community relations coordinator, that is, the requirement that she be physically present at work.[87] Oncale argues that she could fulfill all essential functions of her job, as exemplified by her outstanding reviews, and that CASA fails to cite to any essential function that she was unable to perform.[88]

The Fifth Circuit has held that an essential function for nearly any job is the ability to regularly appear for work. *Credeur v. Louisiana Through Office of Attorney Gen.*, 860 F.3d 785, 793 (5th Cir. 2017); *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996) (holding that "[b]ecause [the plaintiff] could not attend work, he is not a 'qualified individual with a disability' under the ADA") (citing *Carr v. Reno*, 23 F.3d 525, 529–30 (D.C. Cir. 1994) (holding that "coming to work regularly" is an "essential function"), and *Tyndall v. National Education Centers, Incorporated of California*, 31 F.3d 209, 213 (4th Cir. 1994) (holding that

---

[87] R. Doc. No. 7-1, at 6.
[88] R. Doc. No. 9, at 9–10.

regular attendance is an "essential function")); *Grubb v. Southwest Airlines*, 296 F. App'x. 383, 388 (5th Cir. 2008) ("Lack of physical presence is a commonly-accepted disqualification for ADA protection."), *cert. denied*, 556 U.S. 1182, (2009)).[89]

Oncale admits in the complaint that, in order to return to work and be present full time, she would require thirty minutes of time off once a week for six weeks for physical therapy, and one day off per month for immunotherapy.[90] The Court is not convinced that Oncale's absence from work of one day and two hours per month constitutes being unable to regularly appear for work. However, the Court will assume, *arguendo*, that due to her absences, Oncale could not perform all essential functions of her job.

Accordingly, the Court will next determine whether any reasonable accommodation by CASA would have enabled Oncale to fulfill her job duties. *See Sapp*, 539 F. App'x at 595. An accommodation is not reasonable if it would cause an "undue hardship" on the employer. 42 U.S.C. §12112(b)(5). The term "reasonable accommodation" may include, among other changes, "part-time or modified work schedules." 42 U.S.C. § 12111(9).

CASA argues that no reasonable accommodation existed, because the only accommodation Oncale requested, "an indefinite amount of leave for future surgeries

---

[89] Courts have continued to hold, since the passage of the ADAAA, that the ability to regularly appear for work is an essential function of almost any job. *See, e.g.*, *Equal Employment Opportunity Comm'n v. Methodist Hosps. of Dallas*, 218 F. Supp. 3d 495, 501 (N.D. Tex. 2016).
[90] R. Doc. No. 1, at 8 ¶ 43.

in addition to more than 12 weeks of leave already taken," was not reasonable.[91] CASA additionally argues that Oncale's request for an "indefinite amount of leave" was simply a desire for more FMLA leave time, and such a request is not cognizable as a reasonable accommodation under the RA.[92]

Oncale counters that she did not request an indefinite amount of leave, but rather proposed a modified work schedule that involved thirty minutes of time off once per week for six weeks for physical therapy, and one day off per month for immunotherapy.[93] Oncale also points out that her oncologist confirmed with CASA that she would be able to work through radiation.[94]  Oncale contends that CASA could have also made available two other reasonable accommodations, namely, hiring an AmericaCorps VISTA member to temporarily fill her position and allowing her to work from home.[95] Oncale does not directly respond to CASA's assertion that her modified work schedule was a request for more leave under the FMLA, but she argues

---

[91] R. Doc. No. 7-1, at 8–9. CASA also argues that no reasonable accommodation existed that would have allowed Oncale to perform an essential function of her job, attending work. However, 42 U.S.C. § 12111(9) clearly contemplates that a modified or part-time work schedule is a reasonable accommodation that otherwise allows an employee to fulfill the essential functions of her job. *See Trevino v. United Parcel Serv.*, No. 08-889, 2009 WL 3423039, at *12 (N.D. Tex. Oct. 23, 2009) ("An employer . . . may, in appropriate circumstances, have to consider the provision of leave to an employee as a reasonable accommodation[.]").

[92] R. Doc. No. 7-1, at 8–9.

[93] R. Doc. No. 9, at 10.

[94] R. Doc. No. 1, at 7 ¶ 39; R. Doc. No. 9, at 9. Oncale did not request any time off for daily radiation treatments, because she could schedule after work appointments.  R. Doc. No. 1, at 6–7 ¶ 34.

[95] R. Doc. No. 9, at 11.

that the proposed schedule would have been so limited that she would have still been able to work enough hours to be considered full-time.[96]

While CASA is correct that "[i]ndefinite leave is not a reasonable accommodation," *Amsel*, 464 F. App'x at 400, Oncale's complaint does not allege that she requested additional leave from work without an end date. *See Salem v. Houston Methodist Hosp.*, No. 14-1802, 2015 WL 6618471, at *7 (S.D. Tex. Oct. 30, 2015) (holding that the plaintiff's request for additional leave from work was not a request for a reasonable accommodation because she did not provide the defendant with a date on which she anticipated being able to return to work and, therefore, her request was for indefinite leave). Rather, as previously stated, Oncale requested recurring and periodic time off for each of her treatments—that is, she would still appear for work every day, with the exception of thirty minutes a week for physical therapy and one day a month for immunotherapy.[97]

It is true that a second surgery was to be scheduled three to six months after the conclusion of radiation, that is, 4.5 to 7.5 months after her first surgery (taking into  account the six weeks of scheduled radiation), which would have likely required Oncale to take more time off, perhaps even indefinitely.[98] However, even assuming that Oncale's second surgery would have required indefinite leave, and thus no reasonable accommodation would have existed, the specific accommodation that Oncale requested immediately before her termination was *not* a request for indefinite

---

[96] *Id.*
[97] R. Doc. No. 1, at 8 ¶ 43.
[98] *Id.* at 5 ¶ 24.

leave, and it would have allowed her to return to work for at least another 4.5 months, until her second surgery.

With respect to CASA's argument that Oncale's proposed work schedule was a request for more time off pursuant to the FMLA, Oncale's request is distinguishable from that involved in *Trevino*, which CASA cites in support.[99] In *Trevino*, the plaintiff did not make any requests for accommodations, such as a modified work schedule, other than a request for leave pursuant to the FMLA. 2009 WL 3423039, at *12. The court held that "FMLA leave is not a reasonable accommodation under the ADA," because "it is a right enforceable under a separate statutory provision." *Id.*

Unlike the plaintiff in *Trevino*, Oncale did not make her request for a modified work schedule as an assertion of her rights under the FMLA. Rather, according to the complaint, Oncale acknowledged that her FMLA leave would expire on December 27, 2018, but informed CASA that she desired a modified work schedule going forward to accommodate her treatment plan.[100]

The Court cannot determine, at the pleadings stage, that Oncale's request for a modified schedule would have caused an undue hardship on CASA and that, therefore, it was unreasonable as a matter of law.[101] *See* 42 U.S.C. §12112(b)(5). Accordingly, Oncale has plausibly alleged that she could have performed all essential functions of her job had CASA made a reasonable accommodation available and that

---

[99] R. Doc. No. 7-1, at 9.
[100] R. Doc. No. 1, at 7 ¶¶ 36–37, 8 ¶ 43.
[101] Notably, CASA does not argue that providing Oncale with a modified work schedule would have caused it undue hardship.

she was, therefore, otherwise qualified for her position.[102] Because Oncale has sufficiently pled the first two elements of her *prima facie* case, and CASA does not challenge the sufficiency of her allegations with respect to the other two elements, the defendants' motion with respect to count one's RA discrimination claim must be denied.

### B. Rehabilitation Act Failure to Accommodate Claim

The Court next turns to count one's failure to accommodate claim. The defendants' motion to dismiss with respect to this claim must also be denied for many of the same reasons previously discussed.

Under the RA, an employer must institute reasonable accommodations for the disability of an employee, unless those accommodations would cause an undue hardship to the employer. 42 U.S.C. § 12112(b)(5). To establish a failure to accommodate claim under the RA, a plaintiff must show that "(1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Pegues v. Mississippi State Veterans Home*, 736 F. App'x 473, 476 (5th Cir. 2018).

As already discussed, Oncale is a qualified individual with a disability. CASA does not challenge the second element, as Oncale's complaint clearly alleges that

---

[102] Because the Court finds that Oncale plausibly alleged that a modified work schedule was available as a reasonable accommodation, it need not consider Oncale's two other proposed accommodations and CASA's arguments refuting the availability of those alternatives.

CASA was aware of her breast cancer diagnosis and that CASA is a covered employer. With respect to the third element, while CASA argues that no reasonable accommodation existed, for the reasons previously discussed, the Court finds that Oncale has sufficiently pled that a modified work schedule may have been a reasonable accommodation. While a modified work schedule that also accommodated Oncale's second surgery may have been unreasonable, the complaint plausibly alleges that a modified work schedule would have been a reasonable accommodation for the time period between Oncale's first and second surgeries.

Accordingly, the defendants' motion to dismiss must also be denied with respect to count one's failure to accommodate claim, and the Court need not address the other potential accommodations that Oncale alleges were available and reasonable.

## IV.   Count Two

Count two alleges that CASA unlawfully retaliated against Oncale by terminating her because she requested a reasonable accommodation under the RA.[103] To establish a *prima facie* case of retaliation under the RA, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) a causal connection existed between the adverse employment action and the protected activity. *Calderon v. Potter*, 113 F. App'x 586, 592 (5th Cir. 2004) (citations omitted).

---

[103] R. Doc. No. 1, at 12–13 ¶¶ 75–85.

Oncale alleges that she engaged in a protected activity by requesting a reasonable accommodation and that CASA took an adverse action against her, termination of her employment, as a result of this request.[104] CASA concedes that a request for a reasonable accommodation is a protected activity under the RA, but it argues that Oncale's request was *not* reasonable and, therefore, *not* a protected activity.[105] *See Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008) ("It is undisputed that making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity.").

For the reasons previously addressed, the Court finds that Oncale has plausibly alleged that her request for a modified work schedule was a reasonable accommodation under the RA.[106] Accordingly, because CASA only challenges the sufficiency of Oncale's allegations with respect to the first element of her *prima facie* case for retaliation, the defendants' motion must be denied with respect to count two.

## V.     Count Three

Count three alleges that CASA, Brunet, and McNabb interfered with and denied Oncale substantive rights under the FMLA, 29 U.S.C. §§ 2601 *et seq.*[107] Count three further alleges that the defendants retaliated against Oncale for taking FMLA leave.[108]

---

[104] R. Doc. No. 9, at 12.

[105] R. Doc. No. 7-1, at 13–14.

[106] Because the Court finds that Oncale has plausibly alleged that she engaged in a protected activity under the RA, it need not address Oncale and CASA's other arguments in support of their respective positions.

[107] R. Doc. No. 1, at 13–14 ¶¶ 86–98.

[108] *Id.*

The FMLA grants "an eligible employee" up to twelve weeks of annual unpaid leave for "a serious health condition" that prevents her from performing the functions of her job. 29 U.S.C. § 2612(a)(1)(D). The FMLA contains two distinct provisions. The first creates substantive rights, such as the right of the employee to be restored to the same or equivalent position she held when her leave commenced. *Silva v. City of Hidalgo, Tex.*, 575 F. App'x 419, 424 (5th Cir. 2014) (citation omitted); *see* 29 U.S.C. § 2614(a). The second provision protects employees from retaliation for exercising these rights. *Silva*, 575 F. App'x at 424; *see* 29 U.S.C. § 2615(a). Compensatory and liquidated damages are available under the FMLA, as well as appropriate equitable relief and attorneys' fees and costs. 29 U.S.C. § 2617.

The FMLA applies only to "eligible employees" and "covered employers." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017); 29 U.S.C. § 2612. The term "eligible employee" means an employee who has been employed "for at least 12 months by the employer" and "for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2). Excluded from this definition is "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." *Id.*

The term "employer" means "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year," including "any person who acts, directly or indirectly, in

the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4).

## A. Eligibility Under the Family Medical Leave Act

The defendants assert that Oncale's FMLA claims fail because the complaint does not allege that Oncale was an eligible employee and that defendants were covered employers.[109] The complaint alleges that Oncale had worked at CASA since 2013, far exceeding the twelve months required by the FMLA.[110] Furthermore, the complaint alleges that she was a full-time employee which, construing the facts in the light most favorable to Oncale, plausibly means that she worked for at least 1,250 hours during the twelve-month period before she took leave.

The complaint also alleges that "[a]ll defendants were 'employers' within the meaning of the FMLA," but it falls short of asserting that CASA employs fifty or more employees.[111] If CASA employs less than fifty employees, Oncale must be excluded from the definition of eligible employee and CASA is not a covered employer. *See* 29 U.S.C. § 2611(2), (4).

Oncale argues that "even if CASA employs less than 50 employees, [d]efendants are still bound by the FMLA under the doctrine of promissory estoppel."[112] The complaint alleges that the defendants misrepresented to Oncale that she was entitled to leave under the FMLA and that she reasonably relied on

---

[109] R. Doc. No. 7-1, at 11.
[110] R. Doc. No. 1, at 3 ¶ 9.
[111] R. Doc. No. 1, at 13 ¶ 87.
[112] R. Doc. No. 9, at 14.

these assertions to her detriment.[113] Therefore, Oncale argues, the defendants are now estopped from asserting a defense of non-coverage.[114]

### i.    CASA

The Court will first determine whether CASA is estopped from asserting a defense of non-coverage. "[A]n employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an 'eligible employee' and entitled to leave under [the] FMLA, and has reason to believe that the employee will rely upon it, may be estopped to assert a defense of non-coverage, if the employee reasonably relies on that representation and takes action thereon to her detriment." *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 359 (5th Cir. 2006).

In *Minard,* the defendant informed the plaintiff, its employee, that she was eligible for twelve weeks of FMLA leave, which she then took. *Id.* at 354. The defendant subsequently discovered that the plaintiff was not an eligible employee under the FMLA and terminated her on the day she was scheduled to return to work after her leave expired. *Id.* The Fifth Circuit considered the effect of the defendant's prior representation concerning the plaintiff's eligibility for leave under a theory of equitable estoppel. *Id.* at 358–59. The court held that the plaintiff had created a fact issue as to whether she detrimentally relied on the defendant's representations because she testified that had she known she was not eligible for FMLA leave, she

---

[113] R. Doc. No. 1, at 13 ¶¶ 91–93.
[114] R. Doc. No. 9, at 14.

would have pursued other options for her medical condition that would not have required leave. *Id.* at 359.

The complaint alleges that CASA policy cites the FMLA and states that "employees are eligible for up to three months of personal leave, including leave for medical reasons."[115] Brunet allegedly informed Oncale on two different occasions that she was protected by and qualified to take medical leave under the FMLA, but that she would run out of such leave on December 27, 2018, while she recovered from her first surgery.[116] At the November 28, 2018 meeting between Oncale, Brunet, and McNabb, the defendants agreed that they would not terminate Oncale if she returned to work on or before December 27, 2018.[117] If she did not return by that date, her employment with CASA would be terminated.[118] On December 26, 2018, the last day of Oncale's leave, Brunet informed her that she was terminated.[119] The complaint further alleges that Oncale would have returned to work earlier, with certain accommodations, had she known that she was going to lose her job before her FMLA leave expired.[120]

The Court finds that the complaint plausibly alleges that CASA is estopped from asserting a defense of non-coverage and, therefore, Oncale's FMLA claims should not be dismissed on this ground. Oncale's factual allegations clearly assert

---

[115] R. Doc. No. 1, at 4 ¶ 20.
[116] *Id.* at 5 ¶ 26, 6 ¶¶ 30–31.
[117] *Id.* at 7 ¶¶ 36–37.
[118] *Id.*
[119] *Id.* at 9 ¶ 46.
[120] *Id.* at 9 ¶ 48.

that the defendants represented that she was an eligible employee and entitled to leave for medical treatment under the FMLA.[121]  The defendants also had reason to believe that Oncale would rely upon their representation, as Oncale agreed to return the day after her FMLA expired and acknowledged that if she did not do so, she would be terminated.[122]  Oncale's reliance on the defendants' representation was also reasonable, as she was directly told on more than one occasion that she was an eligible employee under the FMLA, and CASA policy cites to the FMLA.[123]

Finally, Oncale took action based on the defendants' representation, as she did not make arrangements to potentially return to work before December 27, 2018. This was clearly to her detriment because CASA terminated her the day before she was scheduled to return to work, and she alleges that had she known she was not protected by the FMLA or that she would have been terminated before the expiration of her FMLA leave, she would have made other arrangements to return to work sooner.[124] *See Minard*, 447 F.3d at 359. Therefore, Oncale plausibly alleges that CASA may be estopped from asserting a defense of non-coverage.

### ii.    *Brunet and McNabb*

The defendants contend that Oncale fails to allege how either Brunet or McNabb played a role in receiving, processing, or approving her leave under the

---

[121] *See id*. at 5 ¶ 26, 6 ¶¶ 30–31.
[122] *See id*. at 7 ¶¶ 36–37.
[123] *See id*. at 4 ¶ 20.
[124] The defendants argue that Oncale did not detrimentally rely on any representation that she was covered by the FMLA because she was not denied any leave under the statute. R. Doc. No. 14, at 2. The Court considers and rejects this argument in section V.B.ii.

FMLA and, therefore, Brunet and McNabb are not covered employers.[125] Defendants alternatively assert that the fact that a corporate employer is estopped from asserting a defense of non-coverage does not necessarily mean that individuals sued in their personal capacities as employers are also estopped from asserting a defense of non-coverage.[126] Therefore, defendants argue, because CASA is not a covered employer as defined by the FMLA, neither Brunet nor McNabb are covered employers and cannot be estopped from asserting a defense of non-coverage.[127]

The Court will first consider whether Brunet and McNabb qualify as covered employers, assuming that individual employers can be estopped from asserting a defense of non-coverage in appropriate circumstances. As previously mentioned, a covered employer includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4).

The Fifth Circuit looks to the Fair Labor Standards Act ("FLSA") when interpreting the reach of the term "employer" under the FMLA. *Modica v. Taylor,* 465 F.3d 174, 186 (5th Cir. 2006) (noting the similarity of the definitions of "employer" under the FMLA and the FLSA when analyzing the reach of individual liability under the FMLA). "The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Martin v. Spring Break '83 Prods., LLC,* 688 F.3d 247, 251 (5th Cir. 2012) (internal quotation marks and citation omitted).

---

[125] R. Doc. No. 7-1, at 12.
[126] R. Doc. No. 14, at 3.
[127] *Id.*

The Fifth Circuit relies on the economic reality test when determining a party's status as an employer under the FLSA or the FMLA. *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (FLSA claim); *Madathil v. Accenture LLP*, No. 18-511, 2019 WL 2913308, at *14 (E.D. Tex. May 29, 2019), *report and recommendation adopted,* No. 18-511, 2019 WL 2905037 (E.D. Tex. July 5, 2019) (FMLA claim). Under the economic reality test, the Court evaluates "whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Orozco*, 757 F.3d at 448. A claimant does not have to establish every element. *Id.* While "[t]he absence of one factor is not necessarily dispositive, . . . the absence of all factors is fatal." *Joaquin v. Coliseum Inc.,* No. 15-787, 2016 WL 3906820, at *2 (W.D. Tex. July 13, 2016). "In cases where there may be more than one employer, [the] court must apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test." *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012) (internal quotation marks and citation omitted).

The Court will analyze each factor with respect to both Brunet and McNabb. Turning to the first factor, construing all of the factual allegations in the light most favorable to Oncale, the complaint plausibly alleges that Brunet, as executive director, and McNabb, as board president, possessed the power to hire and fire CASA employees.[128] On November 21, 2018, both Brunet and McNabb communicated to

---

[128] *See* R. Doc. No. 1, at 2–3 ¶¶ 6–7.

Oncale that they were considering terminating her employment due to her need to take leave.[129] Brunet and McNabb were the only CASA representatives present at the November 28, 2018 meeting in which they informed Oncale that CASA planned to terminate her employment.[130]  After pushback from Oncale, Brunet and McNabb together reversed the decision to terminate her, and informed her that she would not be terminated if she returned to work on or before December 27, 2018.[131] And, Brunet ultimately called Oncale to inform her that she had been terminated.[132]

The Court similarly concludes that the complaint plausibly alleges that Brunet and McNabb supervised and controlled employee work schedules and/or conditions of employment. Oncale alleges that Brunet tracked her sick time and flex time and permitted her to take unpaid leave over the summer and fall of 2018.[133] Oncale sought approval directly from Brunet for her request for leave for her first surgery, and Brunet gathered follow-up information about that request.[134] The complaint also alleges that McNabb supervised Oncale and controlled conditions of her employment, because, as previously mentioned, both he and Brunet made the decision to terminate Oncale and then ultimately reversed that decision at the November 28, 2018 meeting.[135] McNabb also spoke with Oncale's oncologist directly to determine whether she would be able to work while receiving radiation, in order to make an

---

[129] *Id.* at 5 ¶ 25.
[130] *Id.* at 6 ¶ 32.
[131] *Id.* at 7 ¶¶ 36–37.
[132] *Id.* at 9 ¶ 46.
[133] *Id.* at 4 ¶¶ 19, 21.
[134] *Id.* at 5 ¶¶ 23–24.
[135] *Id.* at 6 ¶¶ 32–33.

informed decision with respect to whether to terminate Oncale or allow her to take leave.[136]

Nothing in the complaint alleges that Brunet or McNabb satisfies the third or fourth elements of the economic reality test but, as previously discussed, Oncale does not have to allege facts establishing every element. *See Orozco*, 757 F.3d at 448. Accordingly, the Court concludes that Oncale has plausibly alleged that Brunet and McNabb are covered employers under the FMLA, assuming that individuals may be estopped from asserting a defense of non-coverage.

Turning next to this assumption, the defendants cite no authority for their assertion that a corporate employer can be judicially estopped from relying on a non-coverage defense, but individual employers cannot. The defendants' argument would be persuasive, perhaps, in a situation where the individual employers did not themselves make misrepresentations to the employee about her coverage under the FMLA. However, that is not the case here. The complaint alleges that Brunet and McNabb repeatedly represented to Oncale that she was covered by the FMLA and, in making such misrepresentations, acted "directly or indirectly[] in the interest of [their] employer[.]" *See* 29 U.S.C. § 2611(4).

Having concluded that the complaint sufficiently alleges that all three defendants may be judicially estopped from asserting a defense of non-coverage, the Court will next consider Oncale's claims of interference and retaliation.

---

[136] *Id*. at 7 ¶ 39.

## B. Family Medical Leave Act Interference Claim

To make a *prima facie* case of interference, a plaintiff must demonstrate that "(1) [s]he was an eligible employee; (2) [her] employer was subject to FMLA requirements; (3) [s]he was entitled to leave; (4) [s]he gave proper notice of h[er] intention to take FMLA leave; and (5) [her] employer denied [her] the benefits to which [s]he was entitled under the FMLA." *Tatum v. S. Co. Servs., Inc.*, 930 F.3d 709, 713 (5th Cir. 2019) (citation omitted).

Upon return to work from FMLA leave, an employee must "be restored by the employer to the position of employment held by the employee when the leave commenced" or "to an equivalent position[.]" 29 U.S.C. § 2614(a). Of course, this entitlement is not without limits. "If an employee fails to return to work on or before the date that FMLA leave expires, the right to reinstatement also expires." *Silva*, 575 F. App'x at 425.

### i.

The defendants solely dispute the fifth element, that CASA denied Oncale the benefits to which she was entitled under the FMLA. The defendants argue that although Oncale was "aware of the employment consequences of not returning to work by December 27, [she] was in fact unable to return to work by that date."[137] The defendants characterize Oncale's December 21, 2018 email as "explaining [that] yet more leave would be necessary without mentioning her availability to return to work,

---

[137] R. Doc. No. 7-1, at 16. While the defendants place this argument in the section pertaining to Oncale's FMLA retaliation claim, it is more appropriately considered with respect to Oncale's FMLA interference claim.

thereby admitting she would not have been able to return."[138] Furthermore, the defendants claim that Oncale was actually provided with more leave than afforded by the FMLA, as Oncale was permitted to take sick time, flex time, and an additional twelve weeks.[139] Therefore, the defendants conclude, Oncale was not denied any benefits to which she was allegedly entitled under the FMLA.[140]

Oncale argues that the defendants are estopped from asserting that her FMLA leave expired prior to December 27, 2018, because they affirmatively represented to her that she was entitled to take protected leave until that date.[141] Oncale acknowledges that pursuant to 29 U.S.C. § 2612(d)(2)(B), "[a]n eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided [for a serious health condition] for any part of the 12-week period of such leave[.]"[142] However, according to Oncale, the complaint alleges just the opposite, as the defendants represented to Oncale that her sick time, flex time, and FMLA leave did not run concurrently—that is, the defendants represented to Oncale that her time off under the FMLA began to run only after she exhausted her sick time and flex time.[143]

---

[138] *Id.*
[139] *Id.* at 11.
[140] R. Doc. No. 14, at 2–3.
[141] R. Doc. No. 9, at 17.
[142] *Id.*
[143] *Id.*

Oncale also disputes the defendants' characterization of her December 21, 2018 email. While Oncale acknowledges that she had previously informed Brunet, in response to Brunet's questioning, that she would need a second surgery three to six months after the conclusion of radiation, her December 21, 2018 email did not request leave for the second surgery.[144] Rather, the email requested a modified work schedule to allow Oncale to take thirty minutes off per week for six weeks, and one day off per month.[145] Therefore, Oncale concludes, the defendants interfered with her rights under the FMLA when they terminated her the last day of her FMLA leave—the day before she was to return to work.[146]

### ii.

The Court agrees with Oncale. The complaint does not allege that Brunet, McNabb, or any other representative of CASA ever informed Oncale that her sick time or flex time would count against her twelve weeks of FMLA leave. Rather, the complaint alleges that the defendants and Oncale reached an understanding that Oncale's FMLA leave would expire on December 27, 2018, and that Oncale would be terminated if she did not return to work by that date.[147]

Furthermore, contrary to the defendants' assertion, Oncale's December 21, 2018 email did not indicate that she would be unable to return to work by December 27, 2018.[148] Oncale informed Brunet that she was not experiencing any health issues

---

[144] *Id.*
[145] *Id.*
[146] *Id.* at 18.
[147] R. Doc. No. 1, at 7 ¶¶ 36–37.
[148] *Id.* at 8 ¶ 43.

and requested a modified schedule to accommodate her future treatments for weekly physical therapy and monthly immunotherapy—absent was any request for time off for her second surgery or a request for indefinite leave.[149]  *Cf. Silva*, 575 F. App'x at 425 (holding that the defendant was under no obligation to restore the plaintiff to her previous position when she could not return to work until at least five months after her FMLA leave expired).

After receiving no response from Brunet to her December 21 email, Oncale followed up on December 26, inquiring as to whether Brunet was waiting to see if she would return the next day or waiting for a reply from the board about her request.[150] Oncale was terminated that same day, and she was never given the opportunity to return to work on December 27, the day her FMLA leave expired.[151]

Viewing the facts in the light most favorable to Oncale, the complaint states a claim for interference under the FMLA. CASA terminated Oncale's employment the last day of her FMLA leave, thereby refusing her the benefit of reinstatement to her previous position as community relations director or to an equivalent position. *See* 29 U.S.C. § 2614(a). Accordingly, the defendants' motion to dismiss must be denied with respect to count three's interference claim.

---

[149] *Id.*
[150] *Id.* at 8 ¶ 45.
[151] *Id.* at 9 ¶ 46.

## C. Family Medical Leave Act Retaliation Claim

Count three also alleges that the defendants retaliated against Oncale in violation of 29 U.S.C. § 2615.[152] A *prima facie* case of retaliatory discharge requires that an employee show (1) she was protected under the FMLA; (2) she suffered an adverse employment action; and (3) she was either treated less favorably than an employee who had not requested leave or there is a causal link between the protected activity and adverse employment action. *Harrelson v. Lufkin Indus., Inc.*, 614 F. App'x 761, 763 (5th Cir. 2015); *Tatum*, 930 F.3d at 713.

The defendants challenge only the first element, reiterating their previous arguments that the defendants were not covered employers and Oncale was not an eligible employee.[153] For the reasons previously addressed, the Court finds that the complaint plausibly alleges that CASA, Brunet, and McNabb are judicially estopped from asserting a defense of non-coverage to defeat Oncale's FMLA claims. Accordingly, the defendants' motion to dismiss must also be denied with respect to count three's retaliation claim.

## VI.   Count Four

Count four asserts a retaliatory discharge claim against CASA pursuant to section 510 of ERISA, 29 U.S.C. § 1140.[154]  Section 510 of ERISA makes it unlawful for an employer "to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become

---

[152] R. Doc. No. 1, at 14 ¶ 95.
[153] R. Doc. No. 7-1, at 15.
[154] R. Doc. No. 1, at 14–15 ¶¶ 99–105.

entitled under" an ERISA-governed benefit plan. 29 U.S.C. § 1140. A successful plaintiff may recover benefits due to her under the terms of her plan and reasonable attorneys' fees and costs. 29 U.S.C. § 1132(a)(1), (g).

"A *prima facie* case of discriminatory retaliation under ERISA requires proof that the employer terminated the plaintiff 'in retaliation for exercising an ERISA right or to prevent attainment of benefits to which he would have become entitled under an employee benefit plan.'" *Parker v. Cooper Tire & Rubber Co.*, 546 F. App'x 522, 526 (5th Cir. 2014) (quoting *Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 423 (5th Cir. 2007)). She "need not prove that the discriminatory reason was the only reason for discharge, but [s]he must show that the loss of benefits was more than an incidental loss from h[er] discharge." *Shah v. Chevron USA, Inc.*, 792 F. App'x 301, 304 (5th Cir. 2019) (quoting *Stafford v. True Temper Sports*, 123 F.3d 291, 295 (5th Cir. 1997)) (internal quotation marks omitted).

A plaintiff must also show that she was qualified for her position and present proof of the defendant's specific discriminatory intent. *Custer*, 503 F.3d at 423; *Parker*, 546 F. App'x at 529. A defendant's specific discriminatory intent can be proven by circumstantial evidence, such as close timing between an employee's protected activity and an adverse action against her. *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 260 (5th Cir. 2001); *Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927–28 (5th Cir. 1999).

CASA argues that Oncale's ERISA retaliation claim must be dismissed because she fails to allege any facts from which it can be inferred that CASA

terminated her in order to prevent the attainment of benefits.[155] CASA challenges Oncale's ability to prove specific discriminatory intent, given the fact that CASA informed her that she was being terminated due to her inability to return to work full-time and the exhaustion of medical leave under CASA policy.[156]

Oncale argues that the complaint sufficiently alleges circumstantial evidence of discriminatory intent, as it asserts that she was a long-term, well-regarded employee before she developed cancer, which required many costly treatments; defendants treated her differently once she began treatment, for example, by giving her outstanding performance reviews but criticizing her for being late on days she was approved to receive chemotherapy; Brunet inquired into the extent of her treatment plan, asking if she was having one surgery or two; Brunet acknowledged that the President of National CASA referred to Oncale as a "liability"; and Oncale was ultimately terminated after she informed Brunet that her future treatments would involve radiation, physical therapy, and immunotherapy followed by a second surgery.[157] Oncale also highlights that the complaint alleges that, when Brunet terminated her, Brunet informed her that she would have to pay CASA over $400 per month to maintain her insurance coverage, and that she was treated worse than employees who did not require extensive medical treatment under CASA insurance.[158]

---

[155] R. Doc. No. 7-1, at 19.
[156] *Id.*
[157] R. Doc. No. 9, at 19–20.
[158] *Id.* at 20.

Construing all of the factual allegations in the light most favorable to Oncale, the complaint plausibly states a claim for relief under section 510 of ERISA. The temporal proximity between the November 28, 2018 meeting when Brunet and McNabb informed Oncale that they were considering terminating her and Oncale informing Brunet of the extent of her treatment plan, just two weeks prior, alleges circumstantial evidence from which it can be inferred that once CASA learned of the scope and length of Oncale's treatments, it made the decision to terminate her.[159]

Additionally, Brunet telling Oncale during the same conversation in which she terminated her that Oncale would have to pay over $400 per month to maintain her insurance coverage allows the Court to infer that CASA would save this same amount by not employing her and that it terminated her, at least in part, to eliminate this expense. This inference is bolstered by the President of National CASA's alleged characterization of Oncale as a "liability." Accordingly, because the Court finds that Oncale has plausibly alleged that her "loss of benefits was more than an incidental loss from h[er] discharge," *Shah*, 792 F. App'x at 304, the defendants' motion with respect to count four must be denied.

---

[159] Although the complaint asserts both that CASA terminated Oncale "in retaliation for exercising an ERISA right" and "to prevent attainment of benefits to which she would have become entitled," it fails to specifically allege what right CASA retaliated against Oncale for exercising. *See* R. Doc. No. 1, at 14 ¶ 102. Oncale's opposition to the defendants' motion to dismiss also does not specify what right Oncale exercised that led to her retaliatory discharge, and it solely focuses on CASA's intent to terminate her to prevent the attainment of benefits. *See* R. Doc. No. 9, at 18–19.

## VII.   Count Five

Count five alleges that Brunet and McNabb intentionally interfered with Oncale's employment relationship with CASA in violation of La. Civ. Code art. 2315.[160] A claim for tortious interference with a contract under Louisiana law is of a limited nature. *See Petrohawk Properties, L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380, 395 (5th Cir. 2012).   The essential elements of a claim for tortious interference with a contract are:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Id.* (quoting *9 to 5 Fashions, Inc. v. Spurney*, 88-0902 (La. 1/30/89); 538 So. 2d 228, 232–34 (La. 1989)).

The defendants argue that because Oncale was an at-will employee, she had no contract or legally protected interest in her employment.[161] Oncale argues that the complaint "clearly shows an employment agreement which includes earned and accrued vacation, sick time, FMLA leave policies, percentage merits raises, etc.," and she contends that the defendants should not be able to present "substituted facts" that she was an at-will employee at this stage of litigation.[162]

---

[160] R. Doc. No. 1, at 15–16 ¶¶ 106–115.
[161] R. Doc. No. 7-1, at 24.
[162] R. Doc. No. 9, at 25.

Under Louisiana law, there is an assumption that an employee is at-will, unless a contract provides for a limited term. *See Read v. Willwoods Cmty.*, 2014-1475, p. 5–6 (La. 3/17/15); 165 So. 3d 883, 887 (La. 2015). "An at-will employee simply has no 'legally protected interest in h[er] employment.'" *Newsom v. Glob. Data Sys., Inc.*, 2012-412, p. 5 (La. App. 3 Cir. 12/12/12); 107 So. 3d 781, 786, *writ denied,* 2013-0429 (La. 4/5/13); 110 So. 3d 595 (quoting *Durand v. McGaw,* 93–2077, p. 4 (La. App. 4 Cir. 3/29/94); 635 So.2d 409, 411, *writ denied,* 94–1081 (La. 6/17/94); 640 So.2d 1318). Accordingly, an employment contract alone is insufficient to create a legally protected interest unless it provides for a limited term. *Mendonca v. Tidewater Inc.*, 2005-1166, p. 2 (La. App. 4 Cir. 5/31/06); 933 So. 2d 233, 234, *writ denied,* 2006-1808 (La. 10/27/06); 939 So. 2d 1280.

The Court will assume, *arguendo*, that Oncale did have an employment contract with CASA. However, Oncale only had a legally protected interest in her employment with CASA if this contract provided for a limited term of employment. *See id.* Oncale's complaint fails to allege that such a provision existed.[163] Therefore, Oncale has failed to allege facts that would satisfy the first element of a claim for tortious interference with a contract. The defendants' motion to dismiss must be granted with respect to count five.

---

[163] While Oncale states in her complaint that she "had an employment relation[ship] with CASA that was a legally protected interest," R. Doc. No. 1, at 15 ¶ 109, she fails to allege any facts supporting this essential element. *See Ashcroft*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

## VIII.  Count Six

Count six alleges that CASA violated the LUTPA, La. Rev. Stat. §§ 51:1401 *et seq.*, when it promised Oncale protected time off and then fired her before such time expired.[164] The complaint alleges that CASA's conduct "offends established Louisiana public policy and further is immoral, unethical, oppressive, unscrupulous, egregious, and/or substantially injurious."[165] Count six further alleges that Brunet and McNabb were co-conspirators with CASA, and that they are liable pursuant to La. Civ. Code art. 2324.[166]

The LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). It affords a private right of action to "[a]ny person who suffers any ascertainable loss" as a result of the unlawful conduct. La. Rev. Stat. § 51:1409(A). "To recover, the plaintiff must prove some element of fraud, misrepresentation, deception or other unethical conduct." *IberiaBank v. Broussard*, 907 F.3d 826, 839 (5th Cir. 2018) (internal quotation marks and citations omitted).

"What constitutes an unfair trade practice is determined by the courts on a case-by-case basis." *Id.* (internal quotation marks and citations omitted). But a court should find a practice "unfair under the statute only when" the practice "offends established public policy and is immoral, unethical, oppressive or unscrupulous."

---

[164] R. Doc. No. 1, at 16–17 ¶¶ 116–123.

[165] *Id*. at 16 ¶ 118.

[166] *Id*. at 16 ¶ 120. La. Civ. Code art. 2324(A) provides that "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."

*Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp.*, 292 F.3d 471, 480 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.,* 2009-1633, p. 11–12 (La. 4/23/10); 35 So.3d 1053, 1060 (La. 2010) ("[T]he range of prohibited practices under LUTPA is extremely narrow" and includes "only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct[.]"). "The 'defendant's motivation' is a critical factor—his 'actions must have been taken with the specific purpose of harming the competition.'" *IberiaBank*, 907 F.3d at 840–41 (quoting *Monroe v. McDaniel*, 16-214, p. 10 (La. App. 5 Cir. 12/7/16); 207 So.3d 1172, 1180).

## A.

The defendants argue that count six must be dismissed because Oncale cannot recharacterize her RA and FMLA claims as LUTPA claims.[167] Such employment claims, the defendants argue, are not the kind of claims that the LUTPA was intended to encompass, as the purpose of those federal laws is not to protect consumers or foster competition.[168] Furthermore, the defendants argue, Oncale's allegations do not demonstrate that CASA intended to harm competition when it terminated her.[169]

Oncale contends that the defendants' "bait and switch," offering her leave only to terminate her before such leave expired, constitutes a deceptive act or practice prohibited by the LUTPA.[170] Oncale further argues that she does not have to

---

[167] R. Doc. No. 14, at 3–5.
[168] *Id.*
[169] *Id.*
[170] R. Doc. No. 9, at 22–23.

demonstrate that CASA harmed competition to establish liability under the LUTPA, and that federal courts[171] in Louisiana have recently found employee LUTPA claims identical to Oncale's viable.[172]

## B.

The Court agrees with the defendants that the complaint fails to state a claim for relief under the LUTPA. The pertinent question is whether violations of the public policies set forth in the RA and FMLA fall under the umbrella of "immoral, unethical unscrupulous, and substantially injurious" acts that constitute unfair trade practices under the LUTPA. No federal court in Louisiana or Louisiana state court has squarely addressed this issue. However, considering the purpose of the LUTPA and the claims that Louisiana courts have recognized under the LUTPA, the defendants' alleged deceptive acts simply do not fall within the "extremely narrow" category of conduct prohibited by the statute.

The LUTPA was modeled after the Federal Trade Commission Act (the "Act"). *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co.*, 2013-1582, p. 22 (La. 5/7/14); 144 So. 3d 1011, 1025 (La. 2014). As the Louisiana Supreme Court has explained:

> [T]the two acts share the same goals: to protect consumers and to foster competition. *See* Andrews, 41 Loy. L.Rev. at 777. Specifically, these goals include halting unfair business practices and sanctioning the businesses which commit them, preserving and promoting effective and fair competition, and curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry. *See, e.g., Slough v. Fed. Trade Comm'n,* 396 F.2d 870 (5th Cir.1968), *cert. denied,* 393 U.S. 980, 89 S.Ct. 448, 21 L.Ed.2d 440 (1968) ("The aim of the [Act] is to

---

[171] While Oncale argues that federal *courts*, plural, support her position, she only cites one federal case in support. *See id*.
[172] *Id*.

stamp out unfair business practices and businesses which persist in practicing them."); *United States v. St. Regis Paper Co.,* 355 F.2d 688 (2d Cir.1966) (noting that the policy of the FTC Act is to promote and preserve competition); *Northam Warren Corp. v. Fed. Trade Comm'n,* 59 F.2d 196 (2d Cir.1932) ("[The purpose of the Act] is to strike down at their inception practices which are unfair and which, if permitted to run their full course, would result in the creation of a monopoly and an undue restraint of trade.").

*Id*. at 1025–26.

It is true that, when applying the LUTPA, Louisiana "courts are concerned not only with the interests of competing employers, but also with the employee's interests[.]" *Cheramie Servs.*, 35 So. 3d at 1060. The interest of employees that the LUTPA seeks to protect is their ability to "exercise their right to change employment, even if they decide to work for a competitor of their former employer." *Id*. A Louisiana court has never held that protection from discrimination is another employee interest that the LUTPA also seeks to address—separate statutes encompass these concerns. *See* La. Rev. Stat. §§ 23:301 *et seq*.

Considering the purpose of the LUTPA and the employee interests that Louisiana courts have found that it protects, the defendants' alleged violations of public policy reflected in the RA and FMLA do not give rise to claims under the LUTPA.[173] First, not only does the complaint fail to allege that the defendants' specific purpose in terminating Oncale was to harm competition, it also fails to allege that the defendants' conduct violated *any* purpose of the LUTPA—protecting

---

[173] To be clear, the Court does not hold that a violation of *any* federal law cannot serve as a violation of well-established public policy for purposes of the LUTPA. Rather, the Court holds that, considering the circumstances in this case, alleged violations of the RA and FMLA do not also give rise to a claim under the LUTPA.

consumers, fostering competition, curbing business practices that lead to a monopoly and unfair restraint of trade within a certain industry, or protecting the ability of employees to change employment. *Cf. Guillory v. State Farm Ins. Co.*, 94-1405, p. 27–28 (La. App. 4 Cir. 9/28/95); 662 So. 2d 104, 119 (holding that alleged violations of the Louisiana statute prohibiting insurers from discriminating with respect to the appointment of agents on the basis of race, color, religion, sex, or national origin did not give rise to a claim under the Louisiana statute prohibiting unfair trade practices in the business of insurance); *Quality Envtl. Processes*, 144 So. 3d at 1026 (holding that the plaintiffs' claim of litigation misconduct was not cognizable under the LUTPA because "the goals of LUTPA were not intended to ensure ethical and fair cooperation between attorneys litigating a case").

Second, the one case Oncale cites in support of her contention that federal courts in Louisiana have found LUTPA claims similar to Oncale's viable, *Tripp v. Pickens*, No. 17-0542, 2019 WL 1966132 (W.D. La. May 1, 2019), is readily distinguishable from this case. The plaintiffs in *Tripp* were not former employees of the defendants; rather, the plaintiffs alleged that they had entered into a contractual relationship with the defendants to produce solar pumps, and the defendants' breach of that agreement violated the LUTPA in various ways.  *Id*. at *1, *4–5. The "termination letter" that gave rise to a claim under the LUTPA—which Oncale

attempts to analogize to her termination—purportedly terminated a disputed contract, *not* an employment relationship.[174] *Id.* at *2, *6.

Accordingly, the defendants' motion to dismiss must be granted with respect to count six of the complaint.

## IX.   Count Seven

Count seven of the complaint alleges a claim of intentional infliction of emotional distress against all defendants based on their termination of Oncale while she was recovering from breast cancer treatment.[175]

The defendants argue that the claim must be dismissed because employment disputes, including those involving termination, fail to rise to the level of outrageous conduct necessary to establish intentional infliction of emotional distress.[176] Furthermore, the defendants argue, Louisiana courts have only recognized intentional infliction of emotional distress claims in the employment context in cases that involve a pattern of deliberate, repeated harassment over an extended period of

---

[174] Oncale also cites *Plaisance v. Loop, Inc.*, 84-1014 (La. App. 4 Cir. 2/13/84); 446 So. 2d 511, 512 in support of her assertion that a claim of retaliation for claiming worker's compensation benefits may serve as the basis for a LUTPA claim and, therefore, so should violations of the RA and FMLA. R. Doc. No. 9, at 23 n.61. The *Plaisance* court never considered whether a worker's compensation claim could support an alleged LUTPA claim, as the court found that the complaint stated a cause of action under a separate Louisiana statute, "whether or not it state[d] a cause of action under [the LUTPA]." 446 So. 2d at 512.

[175] R. Doc. No. 1, at 17 ¶¶ 124–131.

[176] R. Doc. No. 7-1, at 23; R. Doc. No. 14, at 6.

time.[177] As Oncale fails to allege that she was harassed, the defendants reason, her claim must fail.[178]

Oncale argues that she has sufficiently pled a claim of intentional infliction of emotional distress because "[n]o reasonable person should expect an employer of six years to demand to call her oncologist to see if treatment was really necessary, or to offer FMLA leave only to then recant, to refuse simple accommodations that were clearly available to other non-disabled employees, and to retaliate and terminate *while on leave* thus jeopardizing health insurance coverage."[179] Oncale further argues that the defendants knew she was particularly susceptible to emotional distress and, therefore, the defendants' conduct should not be judged in the light of the effect such conduct would have on a person of ordinary sensibilities.[180]

### A.

To state a claim for intentional infliction of emotional distress under Louisiana law, "a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 91-0148 (La. 9/9/91); 585 So. 2d 1205, 1209 (La. 1991).

---

[177] R. Doc. No. 7-1, at 23.
[178] *Id.*
[179] R. Doc. No. 9, at 24.
[180] *Id.*

"Louisiana courts . . . have set a very high threshold on conduct sufficient to sustain an emotional distress claim, and the Louisiana Supreme Court has noted that courts require truly outrageous conduct before allowing a claim even to be presented to a jury." *Perrone v. Rogers*, 2017-509, p. 6 (La. App. 1 Cir. 12/18/17); 234 So. 3d 153, 157. "Outrageous conduct is a nebulous concept, as it does not refer to any specific type of conduct and it may even refer to a pattern of conduct." *Id.* "Conduct which is merely tortuous or illegal does not rise to the level of being extreme and outrageous." *Nicholas v. Allstate Ins. Co.*, 99-2522, p. 10–11 (La. 8/31/00); 765 So. 2d 1017, 1025. Rather, outrageous conduct is "conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Stevenson v. Lavalco, Inc.*, 96-28020, p. 3 (La. App. 2 Cir. 2/28/96); 669 So. 2d 608, 611 (citation omitted).

"Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities[,]" as "[p]ersons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Hanna v. Shell Expl. & Prod., Inc.*, 2017-0293, p. 30 (La. App. 4 Cir. 12/6/17); 234 So. 3d 179, 199–200 (internal quotation marks and citation omitted). "The distress suffered must be such that no reasonable person could be expected to endure it." *Perrone*, 234 So. 3d at 158. "Liability arises only where the mental suffering or anguish is extreme." *Id.*

> Further, the defendant's knowledge that plaintiff is particularly susceptible to emotional distress is a factor to be considered. But the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough. The actor's

> conduct must be intended or calculated to cause severe emotional
> distress and not just some lesser degree of fright, humiliation,
> embarrassment, worry or the like.

*Id.* (internal citation omitted).

Louisiana law "affords greater protection to a plaintiff in an employment setting where the alleged wrongdoer is a supervisor with authority over the plaintiff." *Groff v. Southwest Beverage Co., Inc.*, 2008-625, p. 4 (La. App. 3 Cir. 11/5/08); 997 So. 2d 782, 786 (citing *White*, 585 So. 2d at 1205). Nonetheless, recognition of an intentional infliction of emotional distress claim in a workplace setting is "usually 'limited to cases involving a pattern of deliberate, repeated harassment over a period of time.'" *Id.* (quoting *White*, 585 So. 2d at 1210).

### B.

The Court agrees with the defendants that Oncale fails to plausibly allege a claim for intentional infliction of emotional distress. The only act that Oncale alleges caused her emotional distress was her termination—distressing because it was made while she was recovering from her mastectomy and during a period of leave that the defendants had allegedly guaranteed to her.[181] However, "a personnel decision, even if it is wrong, does not give rise to an intentional infliction of emotional distress claim." *Kell v. Iberville Bank*, 352 F. Supp. 3d 650, 663 (E.D. La. 2018) (Barbier, J.) (citing *Nicholas*, 765 So.2d at 1027). Intentional infliction of emotional distress claims "will not lie for mere employment disputes since an employer must be free to demote, transfer, discipline, and terminate employees even though such actions will

---

[181] R. Doc. No. 1, at 17 ¶ 125.

undoubtably be unpleasant and cause emotional distress." *Griffith v. Louisiana*, 808 F. Supp. 2d 926, 935 (E.D. La. 2011) (Vance, J.) (citing *Johnson v. Merrell Dow Pharm., Inc.,* 965 F.2d 31, 33–34 (5th Cir. 1992)).

Oncale argues that her termination was extreme and outrageous due to its timing and her particular vulnerability—recovering from a recent mastectomy—of which the defendants were clearly aware.[182] Oncale is correct that "Louisiana courts have recognized that, '[w]here the actor has knowledge of another's particular susceptibility to emotional distress, the actor's conduct should not be judged in light of the effect such conduct would have on a person of ordinary sensibilities.'" *Kell*, 352 F. Supp. 3d at 663 (quoting *Wright v. Otis Eng'g Corp.*, 94-257, p. 6 (La. App. 3 Cir. 10/5/94); 643 So.2d 484, 487). However, while a plaintiff's susceptibility to emotional distress lessens the necessary severity of the conduct for the plaintiff to make a claim, the plaintiff still must demonstrate a pattern of outrageous conduct. *Id.* (citing *Wright,* 643 So.2d at 487).

The Court accepts that, because the defendants knew Oncale was recovering from her mastectomy, they also knew that she was particularly susceptible to emotional distress. But although that finding lowers the bar for what conduct may qualify as extreme, the alleged conduct does not establish "a pattern of deliberate, repeated harassment over a period of time." *Groff*, 997 So. 2d at 786.  Oncale does not cite any case law suggesting that a termination that may violate the RA and FMLA constitutes conduct that is "so outrageous in character, and so extreme in degree, as

---

[182] R. Doc. No. 9, at 24.

to go beyond all possible bounds of decency," and is "atrocious, and utterly intolerable in a civilized community." *Stevenson*, 669 So. 2d at 611; *see Kell*, 352 F. Supp. 3d at 663 (holding that although the defendant knew the plaintiff was particularly susceptible to emotional distress due to her recent miscarriage, the defendant's termination of the plaintiff in violation of whistleblower protection statutes was not extreme and outrageous).

Therefore, the Court must grant the defendants' motion to dismiss with respect to count seven.

## X.

Accordingly,

**IT IS ORDERED** that the defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the defendants' motion with respect to counts one, two, three, and four of the complaint is **DENIED.**

**IT IS FURTHER ORDERED** that the defendants' motion with respect to counts five, six, and seven of the complaint is **GRANTED**, and that counts five, six, and seven are **DISMISSED**.

New Orleans, Louisiana, June 25, 2020.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**